Roger Lewis COULTER *v.* STATE of Arkansas

CR 90-126                                              804 S.W.2d 348

Supreme Court of Arkansas
Opinion delivered February 18, 1991

528

*Allen & O'Hern Law Firm*, by: *Arthur L. Allen*, for appellant.

*Steve Clark*, Att'y Gen., by: *Clint Miller*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Roger Lewis Coulter was convicted of capital murder. Ark. Code Ann. § 5-10-101 (Supp. 1989). It was alleged that he killed a five-year-old child during the course of, or in furtherance of, raping her. He was found guilty by a jury and sentenced to die by lethal injection. None of the seven points of appeal raised by Coulter warrants reversal of the conviction. As Coulter does not challenge generally the sufficiency of the evidence, we need not render a detailed statement of the facts.

Testimony disclosed that Coulter was living with the child and her mother. On the morning of April 12, 1989, he left the house where they lived. He was to deliver the child to a headstart program as he did from time to time. He returned to the house somewhat later than usual, telling the child's mother that he had had car trouble and had injured his hand by striking the car.

Coulter bathed, ate, and then drove to his mother's home where he borrowed some money. He was seen thereafter at the bank where he cashed a check from his mother.

When Coulter did not return the child home that afternoon, the child's grandmother went to the headstart quarters and found the child had not been there that day. Upon being informed of the situation, the police began looking for Coulter and the child.

Based on reports that Coulter's vehicle had been seen near a power line cut, a search of the area occurred. The child's partially naked body was found stuffed in a hollow tree. An attempt had been made further to conceal her by covering her with branches and leaves. Examination of the body revealed many abrasions and that she had been raped. Hairs found on the body were consistent with Coulter's.

Coulter was arrested in California five weeks after his and the child's disappearance.

### 1. Improperly excused jurors

Coulter contends two jurors were improperly excused for cause, on the prosecution's motion, because of their reservations about capital punishment.

Juror John H. Johnson responded equivocally to the prosecutor's initial questions whether he would be capable of voting for the death penalty, and then said, "Well, to be honest and tell the truth, I don't believe I could do it." He then said again, "I don't know." Defense counsel asked Johnson to imagine a murder "involving one of [his] loved ones: your wife, your mother. Is there a case in which you would consider imposing the death penalty?"

A. Well, since you put it like that, I believe I could. You know, yes sir.
Q. And that's all the law requires.
A. Yeah. All that is required.

Q.   In an appropriate case ---
A.   Right.
Q.   --- that you'd at least consider the death penalty.
A.   Right.

The prosecutor then asked if Johnson could go so far as to actually vote for the death penalty, and Johnson said, "I just couldn't say I could. I don't know." He gave the same response to an inquiry by the judge who then excused him for cause.

Prospective juror Victor Mason began his voir dire responses by saying he did not believe in capital punishment. Like Johnson, he gave some equivocal responses but ultimately said he could vote for capital punishment in a case involving "close kin."

Coulter argues these jurors should not have been excused for cause because neither of them made it unmistakably clear he would "automatically" vote against the death penalty, citing *Witherspoon* v. *Illinois*, 391 U.S. 510, 522 (1968). In *Wainright* v. *Witt*, 469 U.S. 412 (1985), the United States Supreme Court acknowledged confusion resulting both from lower court application of the *Witherspoon* standard and its own variance from the *Witherspoon* standard in *Adams* v. *Texas*, 448 U.S. 38 (1980).

In *Wainright* v. *Witt*, *supra*, the Supreme Court declared the test stated in *Adams* v. *Texas*, to be correct.

> That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon's* reference to "automatic" decision-making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the

printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [469 U.S. 424 - 426, footnotes omitted].

The Supreme Court then notes the deference which must be paid to the trial judge in making such decisions which will be informed by the judge's observance of the prospective juror's demeanor and credibility.

We have no hesitancy in holding the trial court did not err in excluding Johnson and Mason from the jury. Each of them expressed a definite negative attitude toward the death penalty. We defer to the trial judge's finding that their equivocation did not sufficiently ameliorate those expressions to assure they could follow the law if instructed on the death penalty.

## 2. *Aggravating circumstances*

### a. *Constitutionality*

In the sentencing phase of the trial, the prosecutor presented one aggravating circumstance. He asked the jury to conclude that Coulter committed the murder "for the purpose of avoiding or preventing an arrest or effecting an escape from custody." Ark. Code Ann. § 5-4-604(5) (1987). Coulter contends the language of the statute is unconstitutionally vague. He asks that we so declare as we did with respect to the "cruel, heinous, and atrocious" language of Ark. Code Ann. § 5-4-604(8) (1987) in *Wilson* v. *State*, 295 Ark. 682, 751 S.W.2d 734 (1988). We decline to do so.

In *Pickens* v. *State*, 292 Ark. 362, 730 S.W.2d 230 (1987), cert. denied 484 U.S. 917 (1987), we considered a contention that § 5-4-604(5) was too "vague and overbroad as applied to the facts" of that case. We rejected the argument, pointing out that the appellant and his accomplice had remarked they would have to kill their victims because "if they get loose they will burn us."

Coulter cites *Walton* v. *Arizona*, ___ U.S. ___, 110 S.Ct. 3047 (1990), for the Supreme Court's statement that "[I]t is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face." That

decision upheld Arizona's statutory aggravating circumstance, that the offense was committed in an "especially heinous, cruel or depraved" manner because the sentencing judge, rather than jury, could apply the narrowing factors previously announced by the Arizona Supreme Court. The decision is of little use to us here, and Coulter has cited nothing in support of his contention that our statutory "avoiding or preventing an arrest or effecting an escape" aggravating circumstance is vague or overbroad.

■ While a jury may, as in this case, have to determine whether an accused killed to avoid or prevent arrest from circumstantial evidence, we find nothing vague or overbroad in the statutory description of that intent. Coulter has made no convincing argument on this point.

### b. Evidence

Coulter argues he was being sought by the police the day the victim disappeared because he was the last person seen with her; therefore, the killing did not aid him in avoiding apprehension. That is irrelevant to Coulter's intent. He further contends, without citation of authority, that the jury was required to speculate that the killing was committed to avoid arrest or apprehension. Again, we are not convinced by his argument.

The child obviously knew Coulter and would have been able to identify him as the man who raped her. The ends to which Coulter went in trying to hide the body, coupled with his almost immediate departure from the area where the offense occurred, is clear evidence of his other efforts to avoid arrest.

■ While the jury must determine the presence of an aggravating circumstance beyond a reasonable doubt, Ark. Code Ann. § 5-4-603(a)(1) (1987), we will review the sufficiency of the State's evidence in the light most favorable to the State to determine whether any rational trier of fact could have found existence of the aggravating circumstance beyond a reasonable doubt. See *Lewis* v. *Jeffers*, ___ U.S. ___, 110 S.Ct. 3092, 3102-04 (1990), where the Supreme Court used this standard in a *habeas corpus* review to determine if Arizona courts had violated an accused's rights to due process of law or protection of the Eighth Amendment. Applying this standard, we conclude the jury could have found beyond a reasonable doubt that Coulter killed to avoid

being arrested for raping the victim.

### 3. Prosecutor's closing argument

Coulter contends his Eighth Amendment rights were violated by the prosecutor's closing argument in the sentencing phase of the trial. Here is what the prosecutor said and how Coulter's counsel objected:

BY MR. GIBSON [prosecutor]:
If it please the Court.
Mr. Allen.    Ladies and gentlemen of the jury, I know you're tired. We have talked and talked and talked today about the issues in this case, and I hope I don't stay up here too much longer, but I do feel an obligation that I owe the state of Arkansas to seek the death penalty.

The death penalty is not something you impose; it's not something I impose, nor His Honor. It's the law in certain cases. It is in compliance with what justice requires in certain cases. And, if you return a verdict of death, it won't be you putting him to death. It will be the law putting him to death.

MR. ALLEN:    Your Honor, excuse me. I object to that. That's improper argument. It IS the jury's function to make a sentence of death.

MR. GIBSON:    It's a state function, Your Honor.

THE COURT:    Just a minute.

MR. ALLEN:    Your Honor, under *Caldwell versus Alabama*, [sic] that's an improper argument. I object to Mr. Gibson trying to diminish the responsibility of this jury.

MR. GIBSON:    I'm not trying to diminish the responsibility of the jury. I'm just trying to tell them it's not them, personally, putting him to death. That's all.

THE COURT:    Ah, now here's the ruling. The jury has a responsibility to carry out the law, and, ah, I think that is the law, Mr. Allen.

MR. GIBSON:    That's all I'm trying to say, Your Honor. I'm sorry. I won't belabor that point.

THE COURT:    I believe that's the law.

MR. ALLEN:    Yes, it is, Your Honor.

THE COURT:    I believe it's the jury's responsibility

to carry out the law as they see it.

MR. ALLEN: Right.

THE COURT: Okay?

MR. ALLEN: Yes, sir.

BY MR. GIBSON: (continuing)

And, if he is put to death, it will be the law being enforced in a proper case. You, as the Court has already instructed you, shall not be guided by sympathy, and that applies with any sympathy toward the defendant as well. You've got to rely upon the evidence in the case of mitigating circumstances. There's got to be mitigating circumstance that justifies not imposing the death penalty, if you find that the aggravating circumstance exists, and there's not any mitigating circumstances, then the death penalty is appropriate. And I would like for you to follow the law. I know you've said you'll follow the law, and you have told me that you can follow the law.

Now, a little bit about the hypothetical that Mr. Allen brought up. What if you retired to deliberate and came back with the death penalty verdict, and when it was announced, Roger Coulter would fall over due to an apparent — or fall over with a heart attack? Certainly, everybody would run to his aid and try to keep him alive. Because, if we stood by and let him die, we would be violating all sense of humanity. We would be shirking a responsibility. That's not the way he's suppose to die as a result of this trial. And we shouldn't do anything to aid him in dying or prevent, ah, or not try to keep him alive. If he's put to — sentenced to death, it's by legal injection after his right to appeal.

MR. ALLEN: Your Honor, I'm sorry, but I have to object. That, again, is improper argument, and Mr. Gibson knows that that's improper argument.

MR. GIBSON: I'm responding to a proposition that if he fell over dead, everybody would run to his aid, and there's a reason for that, Your Honor!

THE COURT: Mr. Allen, I don't see anything basically wrong with that argument. Certainly the medics would attempt to help him, but that's not the same situation, and he can argue that, I believe, sir.

MR. ALLEN: Your Honor, it's not the medics

helping or not helping. It's bring — talking about the other issues that Mr. Gibson interjected into that.

THE COURT: Well, I think that's an argument which is permissible, Mr. Allen. Proceed.

BY MR. GIBSON: (continuing)

What I'm trying to say is, we've got the value of life on one hand, and then we've got the law and due process on the other, and if he dies, it should be the result of all the protection of society, including due process. And that's why he's getting this very meticulous trial.

Roger Lewis Coulter will die in the Arkansas Department of Correction. Whether it's by lethal injection or after a normal life span depends upon the verdict today.

The prosecutor concluded his remarks by discussing the jury's duty with respect to weighing the aggravating circumstances against any mitigating circumstance or circumstances it found to exist. He thanked the jurors for their service, acknowledging he did not envy their position and that they had a "tough job" to do.

The basis of Coulter's Eighth Amendment claim is the Supreme Court's opinion in *Caldwell* v. *Mississippi*, 472 U.S. 320 (1985). In that case a prosecutor had argued to the jury that, if the jury sentenced the defendant to death, there would be an automatic appeal, and he said "they [the defense] knew that your decision is not the final decision." The Supreme Court reversed the conviction. Some statements in the opinion are as follows:

> [W]e conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been lead to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere [472 U.S. at 328 - 329].

> . . .

> [M]any of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion [472 U.S. at 329].

. . .

In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court.

. . .

. . . for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance [472 U.S. at 330].

. . .

A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion. See e.g., Eddings v. Oklahoma, 455 U.S. 104 (1982); Tackett v. Ohio, 438 U.S. 586 (1978); Woodson v. North Carolina, 428 U.S. 280 (1976). Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role [472 U.S. at 333].

The Supreme Court concluded its opinion as follows:

This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with appropriate awareness of its "truly awesome responsibility." In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amend-

ment requires. The sentence of death must therefore be vacated. Accordingly, the judgment is reversed to the extent that it sustains the imposition of the death penalty, and the case is remanded for further proceedings.

The Supreme Court's specific concern in the *Caldwell* case obviously was with the attempt of a prosecutor to make jurors think that "others", in that case an appellate court, would ultimately be responsible for the death of the person they were asked to sentence to that fate. That, of course, presents a major distinction of the *Caldwell* case from this one. While the prosecutor touched on this Court's role when he said Coulter, if sentenced to death, would die by lethal injection "after his right to appeal," that single remark does not purport to place the responsibility for death sentencing upon "others." But that does not end the discussion.

The issue is whether by saying "The death penalty is not something that you impose; it's not something I impose, nor his Honor" the prosecutor violated the Supreme Court's admonition against attempting to make the jury less cognizant of the "gravity of its task" and less aware of its "truly awesome responsibility."

Viewed in the context of the colloquy among the prosecutor, defense counsel, and the judge, the prosecutor's remarks do not, in our opinion, violate the standard set in the *Caldwell* case. When the objection was raised, the judge responded by saying "the jury has a responsibility to carry out the law." That deflected the prosecutor's references which might have been perceived as suggesting the jury's responsibility was diminished. The prosecutor then agreed, "That's all I'm trying to say Your Honor." Defense counsel then concurred in the judge's statement that it was the jury's responsibility to "carry out the law as they see it."

After the fleeting reference to the "right of appeal," the prosecutor definitely focused his argument on the responsibility of the jurors, sympathizing with them in the performance of a "tough job."

While some of the prosecutor's remarks were on the borderline of diminishing the jury's role in returning a death sentence, when the judge's remarks, those of defense counsel, and the

prosecutor's concluding statements are added, we conclude the jury was made well aware of its duty and no error occurred.

### 4. Overlap with first degree murder

Coulter argues that first degree felony murder, described in Ark. Code Ann. § 5-10-102(a)(1) (1987), is the same as capital felony murder which is described in Ark. Code Ann. § 5-10-101(a)(1) (1987). He argues that, as first degree murder carries a lesser sentencing range, the discretion to charge one offense or the other violates the Eighth and Fourteenth Amendments. He acknowledges that this Court has consistently rejected the argument and does not suggest a reason why this case differs from the earlier ones he cites, *i.e., Simpson* v. *State*, 274 Ark. 188, 623 S.W.2d 200 (1981); *Wilson* v. *State*, 271 Ark. 682, 611 S.W.2d 739 (1981).

As the State points out, our repeated rejection of this argument has continued in recent cases, such as *White* v. *State*, 298 Ark. 55, 764 S.W.2d 613 (1989); *McClendon* v. *State*, 295 Ark. 303, 748 S.W.2d 641 (1988), where we have found no constitutional or other impediment to the discretion conferred by the "overlap" upon the State to choose between the two laws in charging a particular homicide.

Given the lack of argument distinguishing this case from the others, we find no error.

### 5. Lack of meaningful means to obtain post-conviction relief

In *Whitmore* v. *State*, 299 Ark. 55, 771 S.W.2d 266 (1989), we abolished our former Ark. R. Crim. P. 37 which was our rule on post-conviction relief. In an accompanying *per curiam* order we amended Rule 36.4. to require a person convicted of a crime to be notified he had 30 days in which to move for a new trial on the ground of ineffective assistance of counsel. *In the Matter of the Abolishment of Rule 37. and the Revision of Rule 36. of the Arkansas Rules of Criminal Procedure*, 299 Ark. 573, 770 S.W.2d 148 (1989).

We subsequently reinstated Rule 37. in a modified form, but Coulter's case came under Rule 36.4. He argues the Rule allowed him neither practical means nor opportunity to obtain counsel to

help determine whether he had reason to complain of his trial counsel.

During the 30-day period after he was sentenced, Coulter filed a motion styled "Notice of Non-Waiver of Any Claim of Ineffective Assistance of Counsel" in which he stated he planned to raise any claim of ineffective assistance of counsel he might have at the first "meaningful opportunity." He did not move for a new trial or ask the court to appoint counsel to assist him in making a timely decision whether to move for a new trial.

As we have no court order to review on this point, and the motion made by Coulter has no bearing on the finding of guilt or the sentence, we discuss it no further.

### 6. Funds for independent psychiatric evaluation

Coulter sought from the trial court funds to pay for expert testimony about his mental condition as it related to mitigating circumstances. Possible mitigating circumstances include the defendant's being "under extreme mental or emotional disturbance," "unusual pressures or the domination of another person," and lost capacity "to appreciate the wrongfulness of his conduct or to conform . . . to the requirements of the law . . . as a result of mental disease or defect, intoxication, or drug abuse." Ark. Code Ann. § 5-4-605(1), (2) and (3) (1987). The trial court refused the request.

Coulter's appointed defense counsel hired a clinical psychologist to examine Coulter and testify. A $1000 fee to the psychologist was paid personally by defense counsel.

The Supreme Court in Ake v. Oklahoma, 470 U.S. 68 (1985), clearly held that where a defendant's sanity is to be a significant factor in his defense, he is entitled to the assistance of a psychiatrist as a matter of due process. The Supreme Court went further and said such a defendant is also entitled to professional assistance if an issue as to his mentality arises in the penalty phase of the trial.

With respect to the question of a defendant's sanity at the time an offense was committed and competency to stand trial, we have held that the statutorily provided review by the Arkansas State Hospital is sufficient. Parker v. State, 292 Ark. 421, 731

S.W.2d 756 (1987). We have no such holding with respect to additional psychiatric testimony on the matter of mitigating circumstances.

In *Wainwright* v. *State*, 302 Ark. 371, 790 S.W.2d 420 (1990), the trial court allowed $840 for independent psychological testimony provided by a clinical psychologist on the question of mitigation. Our opinion does not indicate the trial court's authority for making the payment. We declined to reverse despite the appellant's argument that he needed more than $840 for the purpose.

Psychiatric examination of a defendant is provided in Ark. Code Ann. § 5-2-305 (Supp. 1989). Subsection (a)(1) makes the psychiatric examination mandatory if the defendant files notice that "there is reason to believe that mental disease or defect of the defendant will or has become an issue in the cause. . . ." Other subsections cover the mechanics of obtaining the examination, and subsection (d) states the matters to be included in the report of the examination:

(1)   A description of the nature of the examination;
(2)   A diagnosis of the mental condition of the defendant;
(3)   An opinion as to his capacity to understand the proceedings against him and to assist effectively in his own defense;
(4)   An opinion as to the extent, if any, to which the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the alleged conduct. . . .

A report on these four items is obviously not broad enough to cover everything a defendant might raise as a "mental defect" basis of mitigation, but it could be expanded by the General Assembly to cover it. That, of course, is not our concern here. Coulter's argument is that he is entitled to a reversal because of the trial court's unwillingness to provide the requested funds.

Coulter got the benefit of the assistance he sought through his appointed counsel's generosity and sense of professional obligation. He makes no argument that the testimony given on his behalf by Dr. William Martin, a clinical psychologist, does not

meet the *Ake* case standard of mandatory "psychiatric" assistance.

■ While there was obviously prejudice to Coulter's defense counsel resulting from his payment of the fee, the prejudice did not extend to Coulter, and we thus will not reverse on this point. *Alford* v. *State*, 291 Ark. 243, 724 S.W.2d 151 (1987); *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984).

## 7. Appointed counsel fee cap

Coulter's attorney made a motion to have the $1000 cap for attorney's fees for appointed counsel in capital cases, Ark. Code Ann. § 16-92-108(b)(2) (1987), declared unconstitutional. He presented a petition for fees which sought recompense for 186 hours of his professional time, $23,250, and out of pocket expenses of $2068. The trial court denied the motion but after further discussion decided to take it under advisement.

A growing number of states have struck down similar fee cap statutes on various constitutional grounds. In *DeLisio* v. *Alaska Superior Court*, 740 P.2d 437 (Alaska 1987), the Alaska Supreme Court held that requiring an attorney to represent an indigent criminal defendant for only nominal compensation unfairly burdens the attorney by disproportionately placing the cost of a program intended to benefit the public upon the attorney rather than the citizenry as a whole. It was said to constitute a taking of property in violation of the state constitution and the Fifth Amendment to the United States Constitution.

In *State Ex. Rel. Stephan* v. *Smith*, 242 Kan. 336, 747 P.2d 816 (1987), the petitioners advanced a Sixth Amendment challenge which argued that:

> [T]he system for appointing counsel adopted by the State violates the right to effective assistance of counsel for two reasons: (1) it creates an inherent conflict of interest between the attorney and client because the more hours an attorney spends on the case, the greater the personal cost to the attorney; and (2) it requires attorneys who are without criminal law experience or expertise to represent indigent criminal defendants.

Another argument raised the Fifth Amendment taking theory

challenging the constitutionality of the Kansas statute which provided for compensation of no more than $1000 to $5000 in most serious cases. The court found the system not to be invalid on its face but conceded that some of the problems with the application or administration of the system could render it unreasonable and arbitrary. The central problem identified was that of unequal operation of the statute because it affected attorneys differently depending on where they lived. After extensive discussion of the state law on the question the court concluded:

> Attorneys make their living through their services. Their services are the means of their livelihood. We do not expect architects to design public buildings, engineers to design highways, dikes and bridges, or physicians to treat the indigent without compensation. When attorneys' services are conscripted for the public good, such a taking is akin to the taking of food or clothing from a merchant or the taking of services from any other professional for the public good. And certainly when attorneys are required to donate funds out-of-pocket to subsidize a defense for an indigent defendant, the attorneys are deprived of property, and are thus subject to Fifth Amendment protection.
>
> When the attorney is required to advance expense funds out-of-pocket for an indigent, without full reimbursement, the system violates the Fifth Amendment. Similarly, when an attorney is required to spend an unreasonable amount of time on indigent appointments so that there is genuine and substantial interference with his or her private practice, the system violates the Fifth Amendment.

In addition, an equal protection violation was argued. The respondents:

> [C]ontend[ed] that the present system violates the equal protection clause in three respects: (1) it treats attorneys differently from other professionals by requiring them to subsidize indigent criminal defense; (2) it treats attorneys differently depending upon their geographic location; and (3) the quality of defense available to indigents depends on

geographic location.

Equal protection violations were found to exist in each of the areas identified under the system in place at the time. A Thirteenth Amendment challenge (involuntary servitude) was rejected on a finding that a condition of servitude is within the Amendment's proscription only when the individual is subjected to physical restraint or threat of legal confinement as an alternative to service. The court concluded that, as no Kansas attorney had been imprisoned for failure to accept an appointment under the statute, there was no violation.

In *Makemson* v. *Martin County*, 491 So. 2d 1109 (Fla. 1986), the Florida maximum fee statutes were found unconstitutional as applied when cases involving extraordinary circumstances and unusual representation were presented. The Florida statute allowed a $1000 cap for representation of juveniles and misdemeanants which is the same amount the Arkansas law allows for a death sentence case. The court found the statute to be an infringement of the inherent right of trial courts to ensure adequate representation and to create a conflict between the rights of the accused to competent representation and the need to protect the treasury. In competition between the two interests the Court concluded that the right to competent representation must win. Finally, the Court concluded that the system unfairly placed the burden of representation of indigent defendants upon a small number of appointed attorneys.

Our law in this area is fairly sparse. In *State* v. *Ruiz*, 269 Ark. 331, 602 S.W.2d 625 (1980), we overturned a trial court's finding of valid constitutional challenges to the fee cap. At that time $350 in fees and $100 for investigation were allowed by the statute. In reversing we discussed the lack of payment provisions at the common law, the presumption of validity attendant to legislative enactments and the obligations of attorneys to provide service without consideration of "lucre."

We alluded to the issue in another case which raised the "taking" argument. We cited a federal court of appeals case which rejected that particular argument on the way to concluding that the statute was valid and the inadequacy of the fees was something to be addressed by the legislature. While this case could be said to have closed the door on any "taking" or due

process argument, in *Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990), we implied that we might reconsider the argument. There we distinguished *State* v. *Ruiz, supra,* saying that the fact that Pickens' counsel volunteered for representation left him with no due process argument. We also stated the statute did not infringe on the inherent power of the trial court to regulate the practice of law and that there was no evidence that the limit affected the right to effective assistance of counsel. In concluding the opinion we wrote, "whatever the trend may be to hold such fee limits unconstitutional, this is not the case in which we will reconsider the issue."

■ In this case, Mr. Arthur L. Allen, a Little Rock attorney was appointed because no local counsel in the Bradley or Ashley County area could be found to take the case. It required extensive time and more out of pocket expenses than will be covered by the statutory fee. Mr. Allen's arguments and citations of authority seem to have merit on the general issue of the constitutionality of the fee cap statute. It may indeed be unconstitutional for any or all of the reasons espoused in the cases cited. We give notice that, in an appropriate case, we will reconsider our earlier decisions on the issue. This is not the case. No facts are stated showing that Coulter was affected by any conflict of interest the fee cap could have created between Coulter and his appointed counsel. No argument is presented to this court showing how Coulter was in any manner prejudiced.

It is instructive to note the manner in which the matter of unconstitutionality of fee cap legislation reached the appellate courts which have declared it unconstitutional. In *De Lisio* v. *Alaska Superior Court, supra,* it began as a contempt citation of a lawyer who refused a court appointment to represent an indigent defendant. In *Makemson* v. *Martin County, supra,* a Florida trial court awarded fees in excess of the statutory cap, and the county which would have to pay the fees sought certiorari. In *State Ex. Rel. Stephan* v. *Smith, supra,* the Kansas Attorney General sought to force two judges to follow the statute by seeking a writ of mandamus. In none of the cases was a criminal defendant's conviction reversed because of prejudice caused by an unconstitutional fee cap. That is not to say that there may not have been such a case or that there may not be one in the future. The point here is that Coulter has neither shown nor even argued

to this Court any specific prejudice resulting from the fee cap statute.

Even if an error of constitutional dimension was made by the trial court in refusing to hold the statute invalid, we will not reverse absent a showing of prejudice. *Goldsmith v. State*, 301 Ark. 107, 782 S.W.2d 361 (1990); *Berna v. State, supra.*

### 8. Comparative review and Rule 11(f) review

In accordance with our policy of comparing death sentence cases to assure that no "freak" or otherwise uncalled for sentence to death is imposed, we have assured ourselves that this is not such a case. *See Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977); *Collins* v. *State*, 280 Ark. 312, 657 S.W.2d 546 (1983) (concurring opinion of Hickman, J.); *Wilson* v. *State*, 295 Ark. 682, 751 S.W.2d 734 (1988), supplemental opinion on reh. (1988).

We also have, as required by our Rule 11(f), reviewed the rulings made against the defendant by the judge during the trial, and we find no error. In the course of the latter review, we were given pause by the photographs introduced by the State into evidence to which Coulter objected. They fully displayed the brutality of the rape committed upon a five-year-old girl and the physical wounds she suffered. We find the photographs were not unduly cumulative, *see Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986), or otherwise unfairly prejudicial.

The offense was committed viciously and warrants, perhaps as much as any we have seen, the severest penalty.

Affirmed.

HOLT, C.J., concurs.

JACK HOLT, JR., Chief Justice, concurring. I concur with the majority in its well-reasoned opinion; however, I would feel remiss if I did not comment upon the present cap of $1,000 for attorney's fees for appointed counsel in capital cases, Ark. Code Ann. § 16-92-108(b)(2) (1987), and the Supreme Court's mandate in *Ake* v. *Oklahoma*, 470 U.S. 68 (1985), which provides, in essence, that a defendant is also entitled to professional assistance if any issue as to his mentality arises in the penal phases of his trial.

*Appointed counsel fee cap*

It is unfortunate that the manner in which § 16-92-108(b) reaches our court does not permit us to rule on its constitutionality.

As mentioned, several states have recently struck down similar fee cap statutes on various constitutional grounds. The majority has cited, at length, portions of opinions from the Alaska, Kansas, and Florida Supreme Courts. Their findings are sound and have merit.

The $1,000 attorney's fee paid to Mr. Allen as appointed counsel in this capital case is a mere pittance. Granted, our state and counties can ill afford to recompense attorneys for their professional time while serving on an appointment on an hour per hour basis, or with fees comparable to those received by attorneys in the private sector who have a criminal/trial practice. However, appointed attorneys should receive much more than token payment for their services.

Under our system of justice, the state and counties fully fund all aspects of the criminal trial; prosecution, trial court, court personnel, jurors, everything except counsel for indigent defendants. When a party is indigent, we provide an incomplete public defender system which renders services in limited areas. Otherwise, the courts call upon attorneys who make their living through their services to perform, and perform well, with little or no compensation, and quite often, to advance expense funds out of their pockets for preparation and trial without any reimbursement. This is necessary so that the defendant can have his day in court.

Under these present arrangements, it is obvious that our judicial system is not complete, and will not be, until funds are provided to reasonably compensate the attorneys who are required to represent truly indigent defendants. This could be accomplished by the creation of a state-wide public defender system for both trial and appellate work. Hopefully, the General Assembly of Arkansas will readdress this issue expeditiously; otherwise, the burden and responsibility will soon fall upon the courts to erase this blotch on our system.

*Funds for independent psychiatric evaluation*

Another matter of "funding" is also before us. It arose during the course of trial when Coulter's appointed counsel petitioned the trial court for funds to pay for expert evaluation and testimony about appellant's mental condition as it related to mitigating circumstances. Counsel was merely discharging his duty of effective assistance by attempting to comply with the Supreme Court's mandate in *Ake* v. *Oklahoma*, 470 U.S. 68 (1985), to provide professional assistance to the appellant as the issue of his mentality was to be an issue during the penalty phase of his trial.

Upon the trial court's failure to fund psychiatric evaluation and testimony, counsel hired a clinical psychologist. As noted in the majority opinion, a $1,000 fee was paid personally by defense counsel to the psychologist, thereby providing the defendant his entitlement under *Ake*, but at the expense of counsel rather than the state. This was not right.

In sentencing under a capital murder charge, our General Assembly has specified procedures and standards pursuant to which a sentencing body must conform in making a determination as to whether or not a sentence of death is to be imposed. Under Ark. Code Ann. § 5-4-603 (1987 and Supp. 1989), a jury must unanimously return written findings that the aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist. Ark. Code Ann. § 5-4-605 (1987) provides that mitigating circumstances shall include, but are not limited to, the following: (1) that capital murder was committed while the defendant was under extreme mental or emotional disturbance; (2) that capital murder was committed while the defendant was acting under unusual pressures or influence of the domination of another person. Obviously these two examples of mitigating circumstances should be presented through competent psychiatric evaluation and testimony. *Ake*, *supra*, requires as much.

We should not compel counsel to fund a necessary ingredient to trial when a defendant is indigent. The state should either provide the resources for examination through its mental health services, or simply provide funds for counsel to obtain these services. It would be very simple for the General Assembly to

expand the responsibilities of the Arkansas State Hospital, when evaluating a defendant, to require that the evaluation also include evaluation as to mitigating circumstances as prescribed by Ark. Code Ann. § 5-2-305 (1987 and Supp. 1989). This could be done, in the first instance, if the defendant is committed to the Arkansas State Hospital for a general evaluation, *see generally* section 5-2-305(d)(1)-(5), or if there has been no previous evaluation, then after the conclusion of the first phase of the bifurcated trial.

If the state does not care to utilize its own resources, then, the responsibility falls on the court to order adequate funding to satisfy the *Ake* requirements.

In sum, appointed defense counsel should no longer be required to assume the burden of defending an indigent for little, if any, compensation or be called upon to fund the necessary elements of his indigent defendant's trial out of his own pocket.