OPINION
{¶ 1} Defendant-appellant, Kevin C. Sayler ("appellant"), appeals the judgment of the Franklin County Court of Common Pleas, which convicted him of harassment with a bodily substance.
 {¶ 2} Columbus Police Officer Jeremy Gilbert arrested appellant and brought him to the Franklin County Jail. Appellant and Gilbert waited outside the jail entrance *Page 2 
because the processing area was busy. While outside, Gilbert threw appellant to the ground, and appellant sustained injuries. The police placed appellant in a paddy wagon to take him to the hospital. While in the vehicle, appellant spat on Columbus Police Sergeant Matthew Weekley, who was investigating the incident with Gilbert.
 {¶ 3} Due to appellant spitting on Weekley, the Franklin County Grand Jury indicted appellant on one count of harassment with a bodily substance in violation of R.C. 2921.38. Appellant pleaded not guilty. Appellant contended that he spat on Weekley as a reflexive response to Weekley spraying him with tear gas while he was choking with blood from his injured nose.
 {¶ 4} A video exists of appellant's detention outside the jail. The video depicts Gilbert throwing appellant to the ground, but the camera recording the video did not capture appellant spitting on Weekley in the paddy wagon. Before trial, plaintiff-appellee, the state of Ohio ("appellee"), filed a motion in limine asking the trial court to bar at trial (1) presentation of the parts of the video of Gilbert throwing appellant to the ground, and (2) testimony about the incident with Gilbert. Appellant filed a memorandum against appellee's motion in limine, and appellant filed a motion in limine asking the trial court to bar, at trial, evidence of appellant's profane language to police while outside the jail.
 {¶ 5} After a hearing, the trial court denied appellant's motion and granted appellee's motion in limine. However, the trial court allowed the defense to state that appellant sustained injuries "as a result of an incident." (Feb. Tr. 16.) The trial court *Page 3 
also ruled that the video presentation would begin at a point after the incident with Gilbert where appellant was lying in a pool of blood.
 {¶ 6} In his memorandum against appellee's motion in limine, appellant referred to and attached a police policy that stated that officers "should not use chemical spray on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public." During the hearing on the motions in limine, appellee asked the trial court to disallow evidence on whether Weekley sprayed appellant with tear gas in accordance with police policy. The trial court granted appellee's request, but stated that the parties could re-examine the issue at trial if appellee "open[s] the door." (Feb. Tr. 29.)
 {¶ 7} Appellant waived his right to a jury, and the case was tried to the court. Columbus Police Officer Kimberly Boyer witnessed appellant's detention outside the jail and testified on appellee's behalf. Boyer testified that appellant was intoxicated and that he was belligerent, combative, and constantly yelling "obscenities or profanities." (Apr. Tr. 21.) Boyer specified that several of the "obscenities or profanities" were directed toward Gilbert and Weekley. (Apr. Tr. 21.)
 {¶ 8} Appellee asked: "[W]as there an incident between [appellant] and Officer Gilbert in which [appellant] was taken to the ground?" (Apr. Tr. 15.) Boyer responded, "Yes, sir." (Apr. Tr. 15.) Boyer testified that appellant had a swollen eye and nose after this incident, but he did not have trouble breathing or speaking afterward.
 {¶ 9} Appellee played the detention video. When appellee started the video, Boyer said that the video was showing events after the incident with Gilbert, and Boyer noted the pool of blood on the ground to the left of appellant's head. *Page 4 
 {¶ 10} Next, Boyer testified as follows. Weekley arrived to investigate Gilbert's "use of force against [appellant]." (Apr. Tr. 27.) Columbus Police Officers Robert Davis and Kyle Fishburn arrived, too. They put appellant on a stretcher and placed him feet first in a paddy wagon. Boyer did not recall anyone ordering Davis and Fishburn to place appellant in the vehicle feet first, and there is no policy about how a person on a stretcher is to be placed in a paddy wagon.
 {¶ 11} Appellant was biting and struggling to move. Boyer did not see appellant spit or choke before or as he was being placed in the paddy wagon. After appellant was placed in the vehicle, Weekley tried to ask him questions and to take photographs for the investigation. Boyer then testified as follows:
 [Appellee]: Is [appellant] saying anything [in the paddy wagon]?
 [Boyer]: He's yelling profanities still. And at one point I was not in direct sight where I could see, but I heard something different. I don't know what that was, and then, Sergeant Weekley turned around and he had been spit on, had spit down from the corner of his mouth across his face.
 [Appellee]: Did Sergeant Weekley have any response to that? Did he take any action?
 [Boyer]: Yes. He then maced the individual.
 [Appellee]: Okay. What occurred after that?
 [Boyer]: He had actually maced him, then he turned around, he had had this spit.
 [Appellee]: Prior to that, prior to seeing Sergeant Matt Weekley with the spit on his face, did you or any other officer or anybody mace [appellant]?
 [Boyer]: No, sir. *Page 5 
(Apr. Tr. 25-26.)
 {¶ 12} Boyer confirmed that she did not actually see anyone spit on Weekley, but Boyer reiterated that Weekley sprayed appellant with tear gas "right after [Weekley] was spit upon." (Apr. Tr. 41.) The court asked Boyer how she knew Weekley was spit upon, and Boyer testified:
 Based on the commotion that I heard, okay. I hear the commotion, and then I see Sergeant Weekley get his mace. He maced [appellant], because when I saw a commotion, that's really when I came * * * to see around Sergeant Weekley. After he maced him he stepped back, he turned and faced me. He had the spit on his face.
(Apr. Tr. 42.)
 {¶ 13} Davis testified as follows on appellee's behalf. Davis and Fishburn went to the jail to take appellant to the hospital. Appellant was "turbulent" and not following instruction. (Apr. Tr. 54.) Appellant was drunk, and he used profanity against Gilbert. Appellant was angry and violent toward Weekley, and appellant used profanity against Weekley. Appellant's behavior "stayed at a constant high." (Apr. Tr. 60.) Appellant had blood on his face, but he was not choking.
 {¶ 14} Davis and Fishburn placed appellant on his side on a stretcher. Appellant was handcuffed, and Davis and Fishburn used two straps to hold him on the stretcher: one around appellant's belt area and another around the chest area. There were no straps that would have prevented appellant from raising his head up off the stretcher. Appellant would have been able to raise his head up approximately one inch. *Page 6 
 {¶ 15} Davis and Fishburn placed appellant in the paddy wagon feet first. There is no policy about how a person on a stretcher is to be placed in a paddy wagon, and Davis did not recall anyone ordering appellant to be placed feet first. Weekley approached appellant while Davis and Fishburn were securing appellant in the vehicle. Davis did not see appellant spit on Weekley because Davis was "facing forward inside the wagon, trying to hook the stretcher to make it stable." (Apr. Tr. 60-61.)
 {¶ 16} Weekley testified as follows on appellee's behalf. Weekley went to the jail to investigate the incident between appellant and Gilbert. Weekley tried to talk to appellant, but appellant was intoxicated, very disrespectful, and extremely belligerent. Appellant was uncooperative and moving around when Weekley tried to take photographs of him. Appellee's counsel showed Weekley the photographs, and Weekley said that the photographs show the dried blood under appellant's nose.
 {¶ 17} Medics examined appellant outside the jail, but they would not take him to the hospital because he was under arrest. Weekley arranged for police to take appellant to the hospital in a paddy wagon. Two or three times, appellant said, "I'm not going to the hospital, just call my lawyer, you fat fuck, so I can get out of here and go fuck your wife." (Apr. Tr. 77.)
 {¶ 18} Fishburn and Davis placed appellant in the paddy wagon. Appellant was on a stretcher. Appellant was handcuffed while on the stretcher, and two straps were restraining him. The straps did not prevent appellant from lifting his head up off the stretcher. Before and as appellant was being placed in the vehicle, appellant did not *Page 7 
have trouble breathing, and he was not coughing, choking or spitting. Likewise, appellant did not have any blood trickling down his nose. The blood had dried on his lip.
 {¶ 19} Appellant was placed feet first in the paddy wagon. Weekley did not order that appellant be placed feet first, and there is no protocol for how people on stretchers are to be placed in a paddy wagon. After appellant was secured, Weekley leaned into the vehicle to try to calm appellant. Appellant spit in Weekley's face. In response, Weekley sprayed appellant with tear gas as a "standard protocol to stop [appellant's] turbulent behavior, from attacking me or any other officer." (Apr. Tr. 91.)
 {¶ 20} On cross-examination, Weekley testified that he talked to witnesses that were present when "Officer Gilbert took [appellant] to the ground." (Apr. Tr. 102.) Weekley denied that he concocted a plan to spray appellant with tear gas after appellant was secured in the paddy wagon, and Weekley denied instructing Fishburn and Davis to place appellant feet first in the vehicle so that he could spray appellant with tear gas. Weekley denied that officers closed the vehicle's rear doors after he sprayed the tear gas. Appellant's counsel played the detention video and said that the video depicts the officers closing the doors. Weekley responded, "I don't think they are fully closed, but yes, it appears that they have closed them somewhat." (Apr. Tr. 118.) Counsel asked Weekley about the video showing someone picking up an object next to the vehicle. Counsel asked if the object was a tear gas canister. Weekley could not recall what the object was.
 {¶ 21} Medic John Figgins examined appellant outside the jail and testified as follows. Appellant had a "mostly more aggressive, offensive demeanor." (Apr. Tr. 126.) *Page 8 
Appellant threatened Figgins with bodily harm. Appellant would "bully" Figgins and "say do you realize how much money I have, what I can do to you." (Apr. Tr. 128.) Figgins asked appellant how he obtained "so much money," and appellant said that he was a professional snowboarder. (Apr. Tr. 128.)
 {¶ 22} Appellant's nose and left eye were swollen; however, no blood was streaming down appellant's face. Appellant was not choking, and Figgins did not recall appellant spitting or coughing. Appellant did not complain about breathing problems, and appellant was able to talk clearly to Figgins. Appellant wanted to lie down several times, and people with respiratory problems do not want to lie down.
 {¶ 23} On cross-examination, Figgins testified that people who have been sprayed with tear gas will "sometimes" want to clear their "airway" by spitting out the tear gas. (Apr. Tr. 136.) The court asked Figgins if appellant was breathing through his mouth or nose. Figgins said he did not know and that appellant "did not seem to have any airway compromise." (Apr. Tr. 139.)
 {¶ 24} Appellant testified on his own behalf as follows. Gilbert arrested appellant for disorderly conduct. Appellant had been drinking heavily. While outside the jail, appellant was confused, dizzy, nauseous, and "couldn't see straight." (Apr. Tr. 150.) Appellant was injured during his detention. He sustained a concussion and a broken nose. After the incident that caused his injuries, appellant woke up in a puddle of blood, and his vision was blurry. Appellant could not breathe through his nose, and blood was dripping down his nose and into his throat. Appellant had to spit blood out to breathe. Appellant testified that the detention video shows appellant spitting on the ground. *Page 9 
 {¶ 25} Weekley arrived and wanted to ask appellant questions. Because his vision was blurred, appellant first mistook Weekley for Gilbert. Appellant told Weekley that he did not want to talk. Appellant was upset and used profane language, but appellant did not threaten any of the officers. Officers placed appellant on a stretcher to take him to the hospital. They strapped him down so that he could not move, and he was lying on his right side. He could hardly move his head because of pain in his neck, back, and head, and he experienced pain every time he tried to lift his head.
 {¶ 26} Officers placed appellant in a vehicle to transport him to the hospital. When appellant was in the vehicle, Weekley started to ask appellant more questions about what happened during the detention, and appellant said he did not want to talk to anyone except an attorney. Appellant was still using profane language. Appellant said "something about [Weekley's] family." (Apr. Tr. 161.) Weekley was angry about what appellant had said. Weekley leaned into the vehicle, said that he had had enough, and sprayed appellant with tear gas. Appellant spit the tear gas out of his mouth. It was not appellant's intention to spit in Weekley's face, and appellant does not know if he spit on Weekley because he was drunk, and his vision was blurred. The police shut the vehicle doors and kept them closed for 20 or 30 minutes.
 {¶ 27} On cross-examination, appellant testified that he was disoriented when he first arrived at the jail. A few times at the jail, appellant called Weekley a "fat fuck" and said that he was going to "fuck [Weekley's] wife." (Apr. Tr. 170-71.) In the paddy wagon, appellant said something like "I can't wait to do something to your wife." (Apr. Tr. 171.) Appellant could not remember exactly what he said at that time, however. *Page 10 
Appellant complained to the medics about having breathing problems. Appellant confirmed that the photographs Weekley took show that the blood on his face appeared to have dried.
 {¶ 28} Appellant's father, Larry Sayler, testified that he visited appellant in the hospital. Larry Sayler said that appellant's face was bruised and that appellant had trouble breathing through his nose because it was taped.
 {¶ 29} During closing argument, appellee claimed that appellant spat on Weekley in retaliation after Gilbert "took him to the ground." (Apr. Tr. 189.) During closing argument for the defense, appellant's counsel noted that appellee did not call Fishburn and Gilbert to testify. Counsel said the court "may assume as the trier of fact * * * there's one of two reasons why those individuals were not called." (Apr. Tr. 192.) Appellee's counsel objected, and defense counsel said, "One can infer that they are either unhelpful or damaging." (Apr. Tr. 192.) The court said that appellant had an "equal opportunity to call witnesses," and the court concluded that the argument was "inadmissible." (Apr. Tr. 192.) Thereafter, the trial court found appellant guilty and sentenced him.
 {¶ 30} Appellant filed a motion for a transcript at state expense for his appeal. To support the motion, appellant filed an affidavit of indigence that stated the following. Appellant's gross monthly income was $150. He had $1,500 in clothes and personal property and $28 in cash. He had $80 in credit card debt. Appellant lives with his parents, but appellant did not list his parents' monthly income in the space provided. Appellant attached a federal tax form that listed his income for 2007 at $2,317. *Page 11 
 {¶ 31} The trial court held a hearing on the motion. Appellant testified that he is a professional snowboarder and that companies sponsor him to enter snowboarding contests. These companies pay appellant's expenses, but not a salary. Appellant did not win any prize money from the contests the previous year. Appellant engages in snowboarding for 120 to 140 days a year. At other times, he works at ski shops and helps his father with his waste disposal business, although his father does not have much work for him. In the past four or five months, appellant made $500 from his father. The income that appellant reported on his tax form came from working at a ski shop. Appellant lives at home, and his parents support him. Appellant once worked for a moving company, but he quit that work because of an injury. Appellant has not attempted to get a full-time job because he needs time for his snowboarding.
 {¶ 32} The trial court concluded that appellant was voluntarily unemployed. The trial court also noted that appellant lives at home and that his parents are supporting him. Thus, the trial court denied appellant's motion for a transcript at state expense.
 {¶ 33} Appellant appeals asserting the following assignments of error:
 FIRST ASSIGNMENT OF ERROR: IT WAS ERROR FOR THE COURT TO GRANT THE STATE'S MOTION IN LIMINE BY DISALLOWING A PORTION OF THE FRANKLIN COUNTY SHERIFF'S SURVEILLANCE VIDEO THAT SHOWED THE DEFENDANT BEING ASSAULTED BY A COLUMBUS POLICE OFFICER.
 SECOND ASSIGNMENT OF ERROR: IT WAS ERROR FOR THE COURT TO GRANT THE STATE'S MOTION IN LIMINE BY SUPPRESSING DEFENSE COUNSELS' RIGHT TO PRESENT EVIDENCE SHOWING THAT A COLUMBUS POLICE SERGEANT HAD VIOLATED DEPARTMENTAL POLICY BY MACING DEFENDANT WHILE HE WAS BOUND AND HANDCUFFED. *Page 12 
 THIRD ASSIGNMENT OF ERROR: IT WAS ERROR FOR THE COURT TO PREVENT DEFENSE COUNSEL FROM COMMENTING ON LEGITIMATE INFERENCES REGARDING THE STATE NOT CALLING OTHER POLICE WITNESSES.
 FOURTH ASSIGNMENT OF ERROR: GIVEN THE ADVANCED STATE OF HIS INEBRIATION, DEFENDANT DID NOT HAVE THE REQUISITE MENS REA TO HAVE PURPOSELY SPIT ON A POLICE OFFICER.
 FIFTH ASSIGNMENT OF ERROR: THE TRIAL COURT'S DECISION FINDING APPELLANT GUILTY OF HARASSMENT WITH BODILY SUBSTANCE IN VIOLATION RC 2921.38 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 SIXTH ASSIGNMENT OF ERROR: IT WAS ERROR AND AN ABUSE OF DISCRETION FOR THE COURT TO DENY DEFENDANT'S MOTION FOR A TRANSCRIPT TO BE PROVIDED TO HIM AT NO COST FOR APPEAL BECAUSE DEFENDANT WAS INDIGENT.
 {¶ 34} In his first assignment of error, appellant argues that the trial court erred by granting appellee's motion in limine that sought to bar presentation of the part of the detention video that depicts Gilbert throwing appellant to the ground. A ruling on a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of an evidentiary issue. State v.Grubb (1986), 28 Ohio St.3d 199, 201-02. A preliminary ruling has no effect until it is acted upon at trial. State v. Chandathany, 9th Dist. No. 02CA0081-M, 2003-Ohio-1593, ¶ 5. When the trial court bars evidence by granting a motion in limine, the opposing party must proffer the evidence during trial so that the court can make a final ruling.Grubb, at 202-03; Chandathany, at ¶ 5; State v. Bobo, 9th Dist. No. 21581, 2004-Ohio-195, ¶ 4-Otherwise, the appellate court has nothing to consider, and the evidentiary issue has *Page 13 
not been preserved for appeal. Chandathany, at ¶ 6; Bobo, at ¶ 6. Without the proffer, the party waives the issue for appeal.Grubb, at 203.
 {¶ 35} At trial, appellant did not seek to introduce the part of the detention video that depicts Gilbert throwing him to the ground. Thus, appellant did not preserve for appeal the issue concerning the admissibility of that part of the video, and we decline to review the issue. See Grubb, at 202-03; Chandathany, at ¶ 5-6; Bobo, at ¶ 6. Accordingly, we overrule appellant's first assignment of error.
 {¶ 36} In his second assignment of error, appellant argues that the trial court erred by granting appellee's motion in limine that sought to disallow evidence on whether Weekley violated police policy when he sprayed appellant with tear gas while appellant was bound and handcuffed. Appellant did not seek to introduce this evidence at trial. Thus, appellant did not preserve for appeal the issue concerning the admissibility of this evidence, and we decline to review the issue. SeeGrubb, at 202-03; Chandathany, at ¶ 5-6; Bobo, at ¶ 6. Accordingly, we overrule appellant's second assignment of error.
 {¶ 37} Appellant's third assignment of error concerns the missing witness inference. Parties seek the inference when the opposition fails to produce the testimony of an available witness on a material issue of its case. See State v. Phillips (Mar. 6, 1979), 10th Dist. No. 78AP-354. Under the missing witness inference, the trier of fact may infer that the missing witness would have given testimony unfavorable to the opposition. Id. Appellant contends that the trial court erred by not allowing trial counsel *Page 14 
to argue during closing argument that the missing witness inference applied to appellee's failure to have Fishburn and Gilbert testify. We disagree.
 {¶ 38} Absent an abuse of discretion, we will not reverse a trial court's determination that a party exceeded permissible bounds of closing argument. State v. Powell, 117 Ohio App.3d 825, 2008-Ohio-4171, ¶ 44. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 39} The missing witness inference applies when the witness is "within the particular power of a party to produce and the testimony of that witness would elucidate the transaction." State v. Melhado, 10th Dist. No. 02AP-458, 2003-Ohio-4763, ¶ 51, citing State v. Long (Sept. 27, 1984), 10th Dist. No. 83AP-444. Appellant argues that Gilbert and Fishburn were within the particular power of appellee to produce because of the police officers' relationship with the prosecution and because of the police officers' likelihood of bias in favor of the prosecution. In support, appellant relies on State v. Davis (1968), 73 Wash.2d 271. InDavis, the Supreme Court of Washington concluded that a police officer was "`peculiarly available'" to the prosecution because of their close relationship in working on criminal cases. Id. at 277. Appellant notes that the Supreme Court of Ohio cited Davis in State v. Jackson (1977),50 Ohio St.2d 253, 256-57, death penalty vacated (1978), 438 U.S. 911,98 S.Ct. 3136. The court in Jackson did not adopt Davis, however.Jackson, at 256-57. Instead, the court noted that the missing witness inference is permissive. Id. at 257. The court also recognized that "`[a] *Page 15 
party is not required to use every prospective witness it may have. Once the prosecution has established its case, it may rest at the point it chooses.'" Id., quoting State v. Edwards (1976), 49 Ohio St.2d 31, 44. Thus, Jackson does not require that we follow Davis.
 {¶ 40} In State v. Fitch (Apr. 17, 1998), 6th Dist. No. L-97-1316, the court noted that "`a missing witness inference based on an officer's absence has been relatively seldom allowed.'" Id., quoting Annotation, Adverse Presumption or Inference Based on State's Failure to Produce or Examine Law Enforcement Personnel-Modern Cases (1990), 81 A.L.R.4th 872, 878-92. In State v. Daugherty (1971), 26 Ohio App.2d 159, 163-64, the court held that the missing witness inference was not available when a police officer was "readily subject to legal process by [the] defendant as well as the state," and when the defendant gave no reason why he could not have issued subpoenas to the police officer. Id. at 164.
 {¶ 41} We similarly conclude that the missing witness inference need not always apply to police officers that the prosecution has not called to testify. The missing witness inference is permissive, and the trial court, as trier of fact, was not required to accept the inference. SeeJackson, at 257. Consequently, we overrule appellant's third assignment of error.
 {¶ 42} In his fourth assignment of error, appellant argues that his intoxication negated the mens rea required to commit harassment with a bodily substance in violation of R.C. 2921.38. We disagree. *Page 16 
 {¶ 43} Under R.C. 2921.38(B):
 No person, with intent to harass, annoy, threaten, or alarm a law enforcement officer, shall cause or attempt to cause the law enforcement officer to come into contact with blood, semen, urine, feces, or another bodily substance by throwing the bodily substance at the law enforcement officer, by expelling the bodily substance upon the law enforcement officer, or in any other manner.
 {¶ 44} In Ohio, prior to October 2000, evidence of voluntary intoxication was available as an affirmative defense when a defendant was charged with a specific intent crime and could demonstrate that he was "`so intoxicated as to be mentally unable to intend anything.'" SeeState v. Terzo, 12th Dist. No. CA2002-08-194, 2003-Ohio-5983, ¶ 17, quoting State v. Otte, 74 Ohio St.3d 555, 564, 1996-Ohio-108. Pursuant to R.C. 2901.21(C), as amended effective in October 2000, however, "[voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." See Sub. H.B. 318, 148 Ohio Laws, Part II, 3410. Voluntary intoxication may only be considered in determining whether a defendant was physically capable of performing the act with which he was charged. R.C. 2901.21(C); Melhado, at ¶ 48.
 {¶ 45} Appellant does not assert that his voluntary intoxication made him physically incapable of spitting; appellant asserts that his voluntary intoxication negated his ability to form the requisite mens rea to commit harassment with a bodily substance. Pursuant to R.C. 2901.21(C), this defense is not available. See Terzo, at ¶ 17;Melhado, at ¶ 48. Accordingly, we overrule appellant's fourth assignment of error. *Page 17 
 {¶ 46} In his fifth assignment of error, appellant argues that his conviction is against the manifest weight of the evidence. We disagree.
 {¶ 47} In determining whether a verdict is against the manifest of the evidence, we sit as a "`thirteenth juror.'" State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387, quoting Martin, at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, 10th Dist. No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting State v. Long (Feb. 6, 1997), 10th Dist. No. 96APA04-511.
 {¶ 48} At trial, appellant admitted to spitting in the paddy wagon. He contended, however, that he spat on Weekley as a reflexive response to Weekley spraying him with tear gas while he was choking on blood from his injured nose. Conversely, Weekley testified that appellant spat on him before he sprayed appellant with tear gas. We find no miscarriage of justice in the trial court accepting Weekley's testimony over that of appellant. See Thompkins, at 387. *Page 18 
 {¶ 49} Appellant contends that Boyer refuted Weekley's testimony. Upon review, we conclude that Boyer's testimony was not clear enough to support appellant or the prosecution with any certainty.
 {¶ 50} Appellant also argues that Weekley is not credible because he lied during his testimony. Appellant asserts that the video refuted Weekley's testimony that the officers did not shut the doors to the paddy wagon after Weekley sprayed appellant with tear gas. The position of the vehicle's doors is unrelated to whether appellant spat on Weekley before he sprayed appellant with tear gas. Thus, the issue with the paddy wagon doors did not undermine Weekley's testimony about when appellant spat on him. Moreover, trial counsel confronted Weekley about this issue at trial, and Weekley did not admit to lying about the doors. Weekley explained that the video shows that the officers closed the doors "somewhat" and that he did not "think [the doors] are fully closed" after he sprayed appellant with tear gas. (Apr. Tr. 118.) Accordingly, we will not interfere with the trial court's decision to reject the defense's credibility challenges arising from the issue with the paddy wagon doors. See Brown, at ¶ 10.
 {¶ 51} Appellant argues that the prosecution's case is not credible because Davis and Weekley's testimony conflict. Davis testified that he did not observe appellant spit on Weekley because he was in the paddy wagon with Fishburn to secure appellant for transport. Weekley testified that, before appellant spit on him, he leaned in to talk to appellant after Davis and Fishburn secured appellant in the vehicle. If any discrepancy between Davis and Weekley's testimonies exists, it is minor and unrelated to Weekley's testimony that appellant spat on him before being sprayed with tear gas. We need not *Page 19 
use a minor, unrelated discrepancy to disturb the trial court's decision to accept Weekley's testimony. See Brown, at ¶ 10.
 {¶ 52} Appellant argues that the police concocted a plan to spray appellant with tear gas after he was restrained in the paddy wagon. Appellant suggests that he was placed feet first into the paddy wagon at Weekley's command so that Weekley could spray appellant with tear gas from the back of the vehicle. None of the officers said that Weekley ordered appellant to be placed in the paddy wagon feet first; however, the officers testified that there is no protocol about how to place an individual on a stretcher in a paddy wagon. Appellant speculates that an item dropped on the ground and retrieved near the vehicle was part of the conspiracy against appellant. Weekley could not recall what the object was, however. Appellant contends that Weekley approached him in the paddy wagon as a ruse to spray him with tear gas, but the record does not support this speculation. Weekley testified that he approached appellant in the paddy wagon to try to calm him, and appellant and Boyer indicated that Weekley wanted to continue the investigation about what happened with Gilbert. Most importantly, Weekley denied concocting a plan to spray appellant with tear gas after appellant was secured in the vehicle.
 {¶ 53} Next, we find that appellant's defense lacks credibility. Neither the police nor the medic testified that appellant was choking or having breathing problems, and the evidence indicated that the blood on appellant's nose had dried when he was in the paddy wagon. This negates appellant's contention that the injuries he sustained from the incident with Gilbert exacerbated his need to spit the tear gas. Appellant's *Page 20 
admission that his perception during the detention was impaired from intoxication further diminished the weight of appellant's testimony. Given the evidence against appellant, it was within the trial court's province to conclude that appellant was belligerent, angry, and uncooperative with the police during the detention, and his combativeness against the police culminated in him spitting on Weekley in violation of R.C. 2921.38.
 {¶ 54} In the final analysis, the trier of fact is in the best position to determine witness credibility. State v. Carson, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 15. The trial court accepted Weekley's testimony that appellant spat on him before he sprayed the tear gas, and appellant has not demonstrated a basis for disturbing the trial court's conclusions. See Brown, at ¶ 10. Accordingly, we hold that appellant's conviction for harassment with a bodily substance is not against the manifest weight of the evidence, and we overrule appellant's fifth assignment of error.
 {¶ 55} In his sixth assignment of error, appellant argues that the trial court erred by denying his motion for transcript at state expense. However, we question appellant's indigence because Figgins testified that appellant bragged about the money he made from snowboarding. Moreover, appellant's affidavit of indigence is missing information about his financial situation. Specifically, appellant admitted that he lived with his parents, but appellant did not list his parents' monthly income in the space provided in the affidavit.
 {¶ 56} In any event, appellant obtained a transcript through his counsel. Therefore, appellant has not suffered any harm, and appellant's argument is moot. See State v. Moore, 93 Ohio St.3d 649, 650,2001-Ohio-1892 (concluding that a defendant's *Page 21 
claim for appointment of counsel in an appeal reopening application is moot because counsel represented the defendant for the application). See also Coulter v. State (1991), 304 Ark. 527, 540-42 (holding that a defendant did not suffer prejudice when counsel personally paid for an expert after the defendant's request for an expert at state expense was denied). Accordingly, we overrule appellant's sixth assignment of error.
 {¶ 57} In summary, we overrule appellant's six assignments of error. Therefore, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
KLATT, J., concurs. BRYANT, J., concurs separately.