# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2192

_____

Don William Davis,                          *
                                            *
          Petitioner - Appellant,           *
                                            *   Appeal from the United States
v.                                          *   District Court for the
                                            *   Western District of Arkansas.
Larry Norris, Director,                     *
Arkansas Department of Correction,          *
                                            *
          Defendant - Appellee.             *

_____

Submitted:  June 20, 2005
    Filed:  September 14, 2005

_____

Before MURPHY, BYE, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

Don William Davis was convicted of capital murder in Arkansas and sentenced to death. His conviction and sentence were affirmed on direct appeal, and his petition for postconviction relief in state court was denied. He then filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. The district court[1] denied his petition as well as a certificate of appealability. We granted a certificate of appealability on two issues and now affirm.

_____

[1]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

## I.

Jane Daniel was found dead in her home from a shot to the back of her head. Several items of jewelry and other property were missing from the home. Investigators later discovered that Davis had pawned some of Daniel's property and had hidden the murder weapon in his bedroom. Davis was charged in an information with capital murder, burglary, and theft of property in November 1990. The state alleged that he had killed Daniel during the commission of a robbery or alternatively that he had killed her with premeditated and deliberate purpose.

Davis was declared indigent by the state trial court and pled not guilty and not guilty by reason of mental disease or defect. Arkansas law requires a trial court to suspend proceedings and order an examination when a defendant's mental disease or defect becomes or is likely to become an issue. A.C.A. § 5-2-305. The circuit court ordered Dr. Travis Jenkins, a psychiatrist at a regional mental health clinic, to examine Davis and to submit a report as to whether there were reasonable grounds to believe that Davis was insane then or at the time of the offense. Dr. Jenkins met with Davis for about an hour and ten minutes and conducted a standard psychiatric interview and mental status examination. Jenkins concluded that while there was no evidence that Davis was incompetent or psychotic, there was evidence of residual attention deficit hyperactivity disorder (ADHD). According to Jenkins' report, ADHD was "not a mental disorder or defect to the degree of criminal irresponsibility," but it "could have contributed to the commission of the alleged offense."

Davis then moved for a complete examination at the Arkansas State Hospital, contending that the Jenkins report failed to comply with the requirements of state law[2]

---

[2]State law requires that the examiner's report include:
(1) A description of the nature of the examination;

and that further evaluation was warranted to develop evidence of mitigating circumstances. The state joined the motion, and the court ordered Davis committed to the Arkansas State Hospital for a thirty day evaluation as provided by state law. In its order the court specifically ordered the hospital to address whether Davis committed the offense while he was under extreme mental or emotional disturbance or unusual pressures or influences,[3] although such an assessment of mitigating circumstances is not required under state law.

The state hospital submitted a report to the trial court stating that Davis was competent to stand trial and did not lack the capacity to conform his conduct to the requirements of law at the time of the crime. The hospital evaluation was based on interviews with Davis, telephone interviews with Davis' father and uncle, a review of Davis' medical history and records from his school years, physical and neurological examinations, and laboratory and other physical studies. Davis received a psychological assessment by a staff psychologist and a psychiatric assessment that

> (2) A diagnosis of the mental condition of the defendant;
> (3) An opinion as to his capacity to understand the proceedings against him and to assist effectively in his own defense;
> (4) An opinion as to the extent, if any, to which the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired at the time of the conduct alleged; and
> (5) When directed by the court, an opinion as to the capacity of the defendant to have the culpable mental state that is required to establish an element of the offense charged.

A.C.A. § 5-2-305(d) (1991).

[3]Under A.C.A. § 5-4-605 mitigating circumstances include but are not limited to whether the "capital murder was committed while the defendant was under extreme mental or emotional disturbance" and whether the "capital murder was committed while the defendant was acting under unusual pressures or influences or under the domination of another person."

included the Minnesota Multiphasic Personality Inventory (MMPI) and the Competency to Stand Trial Assessment Instrument. The report contained diagnoses of alcohol abuse, psychoactive substance abuse, and antisocial personality disorder. It did not address whether there were any mitigating circumstances.

After receiving the state hospital report, Davis moved for funds to hire an independent psychiatric examiner. He asserted that his mental condition would be a significant factor at the penalty phase of his trial and that under Ake v. Oklahoma, 470 U.S. 68 (1985), he was entitled to an independent examination to help him develop and present mitigating evidence for any sentencing hearing. He argued that the evaluation at the state hospital was insufficient because it failed to address mitigation factors and because it was undertaken on behalf of the court and was not protected by physician patient confidentiality or evidentiary privilege. Davis amended this motion to name the clinical psychologist Dr. Marr as the expert he wished to hire and requested $2,000 for his employment. The court denied the motion, and the case went to trial. Davis did not rely on an insanity defense, and the jury convicted him of capital murder, burglary, and theft.

The defense called Dr. Jenkins to testify at the penalty phase of the trial. Jenkins testified that Davis had ADHD and probably had a history of substance abuse. He testified in general about the symptoms of ADHD and stated that Davis had been treated with medication for ADHD at some point as a child. Jenkins testified that one in five people with ADHD will have significant problems either with substance abuse, psychiatric difficulties, or legal difficulties and that a person with ADHD is eleven times as likely to be arrested by the time he is 17 years old. He said that when combined with an unstable environment, childhood abandonment, and drug abuse, ADHD might cause a person to "get into situations through their impulsivity and poor judgment more quickly than perhaps someone without the disorder so that they – even though they might know that something is right and wrong, they might be in the middle of it before they recognize how right and wrong

-4-

it is and the consequences of it." Dr. Jenkins testified that emotional maturity is impaired through serious drug abuse and that Davis had a history of drug abuse starting in childhood. He stated that Davis had told him he was raised by his grandmother after being deserted by his parents. Defense counsel asked Dr. Jenkins about his review of the report prepared by the Arkansas State Hospital, and Jenkins stated that its conclusions were not significantly different from his. He pointed out that the report had made references to dyslexia and learning disabilities and that it said Davis began using drugs and alcohol by the age of 12. Counsel asked Jenkins if he believed that Davis' behavior could have been modified if had received treatment at a younger age, and Jenkins responded, "I would have hoped so."

On cross examination Jenkins testified that, based on his examination, it was his opinion that Davis knew right from wrong at the time he committed the offense, that he was able to appreciate the criminality of his conduct, and that if he killed Daniel, he would have been aware of his actions and would have known he was killing her. The prosecutor also questioned Jenkins about the state hospital report. Jenkins stated that he agreed with its conclusions that Davis was not psychotic at the time of the offense and that he was capable of conforming his actions to the requirements of law, although that would have been more difficult for Davis than for someone without ADHD. Jenkins testified that he found Davis to be of average or above average intelligence and that he was able to converse with him in an intelligent manner. He said that Davis had told him he had been diagnosed with ADHD and treated with medication as a child, but he had not reviewed any of Davis' medical or school records and did not know if he had received additional treatment. He stated that he was not able to interview Davis about the specific circumstances of the crime because he was concerned about incriminating himself, but that he found Davis to be totally responsible for any criminal activity he may have carried out.

On redirect Jenkins testified that drug abuse in a person with ADHD "complicates" judgment and impulsivity and that a person with ADHD who knows

the difference between right and wrong may have difficulty conforming his actions. On recross he testified that Davis was intelligent enough to plan a burglary and to make the decision to rob a person at gunpoint. He was again asked about the state hospital report and affirmed that it reported that Davis had been incarcerated for most of his life after the age of sixteen. Jenkins responded affirmatively to questions about whether Davis had the intelligence to understand that there was a good likelihood that he would be incarcerated if he were convicted and whether he had the intelligence to realize that killing an eyewitness might make it more difficult for the authorities to convict him.

Davis called four other witnesses to testify at sentencing. A counselor who had visited Davis in jail testified that his depression and failure to eat while there could be consistent with guilt or remorse. Davis' father and uncle testified about his family background and stated that he had been abandoned by both parents soon after birth and lived with his grandmother until she sent him to a boys ranch when he was thirteen. Davis' sister testified about his background and lack of treatment for ADHD and about her own child who had been diagnosed with ADHD and the type of treatment he receives. Davis also introduced records from school and the boys ranch.

The court instructed the jury regarding the statutory aggravating circumstances and gave it a form listing them. See A.C.A. § 5-4-604. The court told the jury that the aggravating circumstances were specified by law, that they were the only aggravating circumstances it could consider, and that the state had the burden of proving beyond a reasonable doubt that one or more of the listed aggravating circumstances existed at the time of the capital murder. The jury found two statutory aggravating circumstances. It found that Davis had committed the murder for pecuniary gain and to avoid arrest or effect an escape from custody. Although at least one member of the jury found that Davis' lack of treatment for ADHD was a mitigating factor, the jury found that the aggravating factors outweighed beyond a reasonable doubt any

mitigating circumstances and that a death sentence was justified.[4] The circuit court sentenced Davis to death by lethal injection on the capital murder charge and 40 years imprisonment on each of the burglary and theft charges.

Davis appealed his conviction and sentence to the Arkansas Supreme Court. One of the errors he claimed was the trial court's failure to provide funds for an independent psychiatric expert. The supreme court affirmed his conviction and sentence, concluding that the trial court had not erred by refusing to provide such funding because it had approved two previous psychiatric evaluations. Davis v. State, 863 S.W.2d 259 (Ark. 1993), cert. denied, 511 U.S. 1026 (1994).

Davis sought postconviction relief in state court under Arkansas Rule of Criminal Procedure 37. Dr. Marr submitted an affidavit stating that he had reviewed Dr. Jenkin's diagnosis of ADHD and the transcript of the penalty phase of the trial. He said he was aware of some of the circumstances of Davis' background, which included neglect and deprivation by his parents during childhood, learning disabilities, poor performance in school, and lack of consistent focused treatment for ADHD. Dr. Marr said that if he had been appointed by the trial court, he would have provided Davis' attorneys with advice, instruction, and guidance in the preparation and use of the information from his evaluation in order to develop and present mitigating evidence at the penalty phase. He would have been able to act as Davis' psychologist, and his conferences would have been protected by the psychotherapist patient privilege. He would have reviewed all available records about Davis, would have interviewed his family and friends, and would have administered psychological tests. In his judgment a full exploration of Davis' psychological condition would

---

[4]For the death penalty to be imposed under Arkansas law, the jury must have unanimously found beyond a reasonable doubt that aggravating circumstances exist, that the aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist, and that the aggravating circumstances justify a sentence of death beyond a reasonable doubt. A.C.A. § 5-4-603(a).

have required a complete neuropsychological examination because of his history of head injury and psychological trauma as a child and would have included an MMPI and the Gordon Diagnostic Test for ADHD.

Davis' trial counsel testified at the postconviction proceeding. His attorneys had interviewed doctors and a social worker from the state hospital prior to the penalty phase of trial and had learned that they would be of no help in respect to mitigating circumstances. The social worker stated that the hospital did not believe that drug or alcohol abuse, child abuse or neglect, or ADHD were mitigating factors. Davis' attorneys contacted Dr. Jenkins, who said he was willing to testify at the penalty phase. At the postconviction hearing the court asked one of Davis' attorneys if Jenkins had been a willing participant at the sentencing phase of the trial, and he responded that Jenkins had been helpful.

Davis also raised a claim of ineffective assistance of counsel for his counsel's failure to cite and argue the effect of Coulter v. State, 804 S.W.2d 348 (Ark. 1991), both at trial and on direct review. The trial court denied postconviction relief, and the state supreme court affirmed. Davis v. State, 44 S.W.3d 726 (Ark. 2001).

II.

After exhausting his state court remedies, Davis filed this petition in the district court seeking a writ of habeas corpus under 28 U.S.C. § 2254. He raised seventeen separate grounds for relief. These included four due process claims, ten claims of ineffective assistance of counsel, a double jeopardy claim, a claim that the court violated his Fifth and Sixth Amendment rights by allowing certain parts of Dr. Jenkins' testimony, and a claim that his death sentence was unconstitutional due to the improper use of jury instructions and verdict forms. The district court denied the petition and denied a certificate of appealability. This court granted a certificate on two of the claims made by Davis: 1) that he was denied due process when the trial

court denied his request for funds to hire an independent psychiatric expert to present mitigation evidence, and 2) that his counsel was ineffective for failing to argue that Coulter v. State, 804 S.W.2d 348 (Ark. 1991), required the trial court to make such funds available.

## A.

When a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus can only be granted where the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d) (AEDPA). A decision is "contrary to" federal law in the AEDPA sense if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or if it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrived at an opposite result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court unreasonably applies clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Habeas relief cannot be granted just because a federal court concludes that the state court erred in its application of federal law; the test is whether the state court's application of the law was unreasonable. Id. at 411.

B.

Davis argues that the district court's failure to provide funds for an independent psychiatric expert to present mitigating evidence at sentencing violated due process and was contrary to and an unreasonable application of clearly established Supreme Court precedent. Davis contends that Ake v. Oklahoma, 470 U.S. 68 (1985), required the appointment of an independent psychiatric expert to aid him at sentencing and that the ability to subpoena and question a neutral expert does not satisfy due process. He points out that the Arkansas Supreme Court recognized in Coulter v. State, 804 S.W.2d 348, 356 (Ark. 1991), that the psychiatric examination and report mandated by state statute is not broad enough to cover everything a defendant might raise as a mitigating circumstance.

Davis contends that the testimony given by Dr. Jenkins at the penalty phase of trial did not satisfy the requirements of Ake because Jenkins was not able to evaluate the specifics of Davis' situation as they applied to mitigation because he did not administer any tests, review past records, or speak with Davis about the circumstances of the crime. He cites Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1994), for the proposition that due process was not satisfied by his merely being able to question Jenkins, a neutral court appointed expert, at the penalty phase of trial. If the court had granted him funds to hire Dr. Marr, Marr would have provided his attorneys with advice, instruction, and guidance in the preparation and use of information to develop and present mitigating evidence. Additionally, his conferences with his psychologist would have been protected by the psychotherapist patient privilege, unlike a conference with an expert appointed by the court to determine sanity at the time of the offense. Davis contends that the district court's refusal to grant funds to hire Dr. Marr resulted in an unfair trial because the jury was not able to hear and weigh all the available mitigating evidence, citing Skipper v. South Carolina, 476 U.S. 1 (1986) (exclusion of relevant mitigating evidence required reversal of death sentence).

The state responds that Davis' request for assistance under <u>Ake</u> was satisfied by the court's appointment of Dr. Jenkins and his testimony at sentencing. The state points out that <u>Ake</u> specifically stated that an indigent defendant does not have a constitutional right to choose his own psychiatrist or to receive funds to hire his own, 470 U.S. at 83, but rather is entitled to "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." <u>Id.</u> The state contends that this is exactly what Davis received from Dr. Jenkins.

In <u>Ake</u>, the Supreme Court held that due process requires that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. The Court came to a similar conclusion in respect to the capital sentencing proceeding in <u>Ake</u>. Where the state presents psychiatric evidence of the defendant's future dangerousness, "due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." <u>Id.</u> at 84. Our cases have interpreted <u>Ake</u> to require the appointment of an expert only if the defendant shows "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." <u>Little v. Armontrout</u>, 835 F.2d 1240, 1244 (8th Cir. 1987) (en banc).

The defendant in <u>Ake</u> relied solely on an insanity defense, and psychiatric testimony regarding his future dangerousness was used by the state and was a "significant factor" at the penalty phase. 470 U.S. at 86-87. The defendant's "bizarre" behavior at arraignment was another factor which caused the Supreme Court to fashion its remedy in that case. <u>Id.</u>

In this case Davis did not rely on an insanity defense, and the state did not present any psychiatric evidence or evidence regarding Davis' mental condition at sentencing. Dr. Jenkins nevertheless testified quite extensively for the defense. Dr. Jenkins had interviewed Davis prior to trial and conducted a standard psychiatric interview and mental status examination. Jenkins testified on Davis' behalf at sentencing about his conclusions that Davis had ADHD and probably a history of substance abuse. He testified that one in five people with ADHD will have significant problems with either substance abuse, psychiatric difficulties, or legal difficulties and that a person with ADHD is eleven times as likely to be arrested by the time he is 17 years old. Jenkins said that when combined with an unstable environment, childhood abandonment, and drug abuse, ADHD might cause impulsivity and poor judgment so that a person could be in the middle of a situation before realizing whether it was right or wrong and what the consequences would be. Jenkins said that Davis had told him he had been raised by his grandmother after being deserted by his parents and that he started using drugs regularly in his childhood. Jenkins testified that drug abuse in a person with ADHD complicates judgment and impulsivity and that a person with ADHD who knows the difference between right and wrong may have trouble conforming his actions. He said that Davis had told him he had been treated with medication for ADHD as a child, but he did not know if Davis had received additional treatment. When defense counsel asked Jenkins if he believed that Davis' behavior could have been modified if he had received treatment at a younger age, Jenkins responded, "I would have hoped so."

Dr. Marr stated in his affidavit that he would have reviewed all available records about Davis, interviewed Davis' family and friends, and would have administered an MMPI, the Gordon Diagnostic test for ADHD, and a complete neuropsychological examination. The examination of Davis at the state hospital did, however, include a review of Davis' records, interviews with family members, an MMPI, and physical and neurological examinations, and Dr. Jenkins testified that he had reviewed the state hospital report and that its conclusions were not significantly

-12-

different from his. There is no indication in the record that an examination by Dr. Marr would have led to different results. Jenkins testified that Davis had ADHD, and the state did not dispute that conclusion. Moreover, at least one juror concluded from the evidence presented that Davis' lack of treatment for ADHD was a mitigating factor.

What Davis asks for in this case would go beyond the assistance required by Ake, where the Supreme Court stated that an indigent defendant is not entitled to choose his own psychiatrist or to receive funds to hire his own. 470 U.S. at 83. Unlike the state expert who was subpoenaed by the defense in Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1994), Dr. Jenkins agreed to testify for the defense and was able to answer the questions put to him by defense counsel. Defense counsel affirmed in the postconviction hearing that Jenkins had been a willing participant at sentencing and said that he had been helpful. We conclude that Dr. Jenkins' assistance met the requirements of Ake, and the state court's denial of funds was not contrary to or an unreasonable application of clearly established federal law.

C.

Davis also argues that his counsel was ineffective at trial and on direct appeal for failing to cite Coulter v. State, 804 S.W.2d 348 (Ark. 1991), in support of his argument that he was entitled to an independent psychiatric examination. In Coulter, the Arkansas Supreme Court held that the trial court's refusal to grant funds for a psychiatric evaluation regarding mitigation did not require reversal because defense counsel had paid for an examination that met the Ake standard. The court noted that the psychiatric review provided by A.C.A. § 5-2-305 was "obviously not broad enough to cover everything a defendant might raise as a 'mental defect' basis of mitigation." 804 S.W.2d at 356. Davis contends that his counsel was ineffective for not raising Coulter because the case clearly invited the argument that the examination

-13-

and report he received under A.C.A. § 5-2-305 were inadequate to prepare mitigation evidence.

To prove that his counsel rendered ineffective assistance in violation of the Sixth Amendment, Davis must satisfy the two prong test outlined in Strickland v. Washington, 466 U.S. 668 (1984). Davis must first show that his counsel's performance was deficient. Id. at 688. To satisfy this prong Davis must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. Id. at 689. Even if Davis could prove deficient performance, he would still have to prove prejudice by showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. To prevail on his claim of ineffective assistance, Davis must therefore prove that the outcome would have been different if his counsel had cited and argued Coulter at his trial or that the state supreme court would have reversed the conviction if counsel had cited Coulter on direct review.

Regardless of whether counsel's performance was deficient, no reasonable probability exists that a citation to Coulter would have led to a different result. See Pfau v. Ault, 409 F.3d 933, 939-40 (8th Cir. 2005) (no reasonable probability existed that appellate counsel's citation to a state supreme court case would have resulted in the supreme court's reversal of the trial court's evidentiary decision). On state postconviction review, the Arkansas Supreme Court stated that Coulter had not resolved the issue of whether a defendant is entitled to funds to hire an independent expert to advise him about mitigating factors, but rather that Coulter had left this question undecided. Davis v. State, 44 S.W.3d 726, 732 (Ark. 2001). Our reading of Coulter is consistent with that conclusion. Defense counsel in Coulter had hired a clinical psychologist at his own expense to testify on defendant's behalf at the penalty phase of his trial. The issue on appeal was whether the conviction should be reversed

-14-

because the trial court had refused to provide funds for the expert. The supreme court affirmed the conviction, pointing out that the defendant had received the benefit of the psychologist's assistance and that he had made no argument that the psychologist's testimony did not meet the requirements of Ake.

We have already concluded that Dr. Jenkins' testimony satisfied due process, and the dicta Davis cites from Coulter does not establish a reasonable probability of a different outcome at trial or on direct appeal. Like the defendant in Coutler, Davis received the benefit of expert testimony during the penalty phase of his trial. There is no indication that if counsel had cited Coulter to the trial court, it would have appointed an independent psychiatric expert who could provide testimony that was more favorable than Dr. Jenkin's. Moreover, the Arkansas Supreme Court was aware of and had the benefit of its decision in Coulter when it heard Davis' direct appeal. The supreme court had decided Coulter just two years prior to Davis' appeal, it included two citations to Coulter in its decision in Davis' case, and Coulter was cited by the concurrence as well. Davis v. State, 863 S.W.2d 259, 263, 265, 267 (Ark. 1993). Davis has therefore not shown that his counsel's performance violated the Sixth Amendment.

D.

Finally, Davis has moved for a remand to the district court for further proceedings. He claims there is significant evidence that he is mentally retarded[5] and

---

[5]Davis has presented evidence that at age 9 his IQ score on the Peabody Picture Vocabulary Test (PPVT) was 69, placing him in the very slow learner range. The Wechsler Intelligence Scale for Children (WISC) was given at the same time and returned an IQ of 94, although Davis argues that this number was artificially inflated and that the version of the test he took was unreliable. He also had an IQ score of 77 on a test given when he was 12 years old, which he says is consistent with subaverage intellectual functioning.

that his death sentence is unconstitutional in light of Atkins v. Virginia, 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibits the execution of mentally retarded criminals).

The state responds that Davis could have presented his Atkins argument to the district court because the Supreme Court issued its opinion in Atkins while Davis was still litigating his habeas petition. The state argues that Davis' motion to remand is equivalent to a request to file a second habeas petition and should be denied because he did not file his new application within the one year statute of limitations in 28 U.S.C. § 2244(d)(1)(C).[6]

Davis concedes that he did not raise the issue of mental retardation in state court or in his federal habeas corpus petition, but he contends that even if his motion to remand is viewed as a second or successive habeas petition under § 2244(b), the one year limitations period in § 2244(d)(1)(C) does not apply.

Davis' motion to remand is the functional equivalent of a second or successive petition for habeas corpus because he seeks to amend his original petition and obtain an evidentiary hearing on the Atkins issue. See Smith v. Armontrout, 888 F.2d 530, 540 (8th Cir. 1989) (motion to remand to the district court to raise new claim is the functional equivalent of a second or successive petition); see also Guinan v. Delo, 5 F.3d 313, 316-17 (8th Cir. 1993) (Rule 60(b) motion seeking relief from the denial of habeas petition properly treated as a second habeas petition). Under 28 U.S.C. § 2244(b)(2)(A), a petitioner may not bring a second or successive habeas application

---

[6]The state also cites journal articles stating that the PPVT was not designed "as a screening tool for measuring intellectual level of functioning" and that "its scores are not interchangeable" with IQ scores obtained from other tests, and it points out that the report from the Arkansas State Hospital stated that Davis' intellectual functioning was "at least within the average range of abilities." We note in addition that Dr. Jenkins found Davis to be of average or above average intelligence.

on a claim that relies on new law when it was not presented in a prior application unless "the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

The rule in Atkins prohibiting the execution of mentally retarded defendants was made retroactive to cases on collateral review by Penry v. Lynaugh, 492 U.S. 302, 330 (1989) (stating that such a rule would apply retroactively to defendants on collateral review), but the Atkins rule was not previously unavailable to Davis because he could have raised this issue while he was litigating his habeas petition in the district court. The Supreme Court heard oral argument in Atkins v. Virginia, 536 U.S. 304 (2002), on February 20, 2002, more than a month before Davis filed his petition for habeas corpus on April 1, 2002. While Davis was litigating that petition and well before his scheduled evidentiary hearing in September 2002, the Court's opinion in Atkins was issued on June 20, 2002. The evidence Davis relies on in support of his request to raise this claim was available to him in the district court, and he earlier used some of this same evidence in state court. Although the issue was available to Davis, he did not attempt to present an Atkins claim to the district court and instead waited until after filing this appeal to seek permission to raise it. Since Davis could have raised his Atkins claim in the district court, it was not previously unavailable to him, and his second or successive habeas petition must be dismissed under 28 U.S.C. § 2244(b)(2). The motion to remand is denied.

## III.

In conclusion, the state court's denial of funds to hire an independent psychiatric expert was not contrary to or an unreasonable application of the Supreme Court's decision in Ake v. Oklahoma, and Davis' sixth amendment rights were not violated by his counsel's failure to cite Coulter v. State at trial or on direct appeal. Since Davis' motion to remand is equivalent to a successive habeas petition and his

claim under <u>Atkins v. Virginia</u> could have been brought below, the motion to remand is denied. For these reasons the judgment of the district court is affirmed.

BYE, Circuit Judge, concurring in part and dissenting in part.

I join in the portion of the Court's decision affirming denial of Davis's ineffective assistance of counsel claim as well as denial of his 28 U.S.C. § 2244(b)(3)(A) request to file a second or successive application. But because I believe the state court decisions purporting to apply <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985) fall substantially short of what the Constitution requires, I dissent from part II.B. of the majority's analysis.

I

Under Ark. Code Ann. § 5-2-305(a), the trial court was required to order a psychological examination when Davis asserted an insanity/diminished capacity defense. The trial court ordered Davis examined by Dr. Travis Jenkins, a psychiatrist, who interviewed him for approximately one hour and ten minutes. Dr. Jenkins did not conduct any psychological testing, review any medical records, or interview persons familiar with Davis. Following this rather brief interview, Dr. Jenkins issued a report concluding there was no evidence Davis was incompetent or psychotic, but there was evidence he suffered from attention-deficit hyperactivity disorder (ADHD) which would not have affected his ability to appreciate the wrongfulness of his conduct, but could have contributed to the crimes.

Thereafter, Davis and the state moved for a complete psychological examination at the Arkansas state hospital to address issues of mental disease or defect relevant to the guilt phase of the proceedings. The joint motion also requested further investigation into Dr. Jenkins's diagnosis to develop evidence of mitigation for use in the penalty phase of the trial. The trial court granted the motion and

ordered, among other things, the state hospital report address whether Davis's mental condition would qualify as a mitigating circumstance. This hospital issued a report concluding Davis was competent to stand trial and able to conform his conduct to the requirements of the law at the time of the crimes. The report diagnosed Davis as suffering from alcohol and drug abuse and antisocial personality disorder, but ignored the district court's order to address whether the diagnoses might qualify as mitigating factors for sentencing purposes.

Understandably, Davis moved for state funds to retain an independent psychiatric expert to investigate and fully develop evidence of mitigation. He argued Dr. Jenkins's report concluded his mental state may have contributed to the commission of the crimes, and he had a right under Ake to an independent examiner who could assist in fully developing the mitigation evidence. Surprisingly, after acknowledging the state hospital ignored its order to address the issue of mitigating evidence, the district court denied the request.

At trial, Davis's only recourse was to call Dr. Jenkins who reiterated his preliminary diagnosis of ADHD and offered general testimony about how ADHD might contribute to criminal behavior. Dr. Jenkins, however, was unable to testify specifically about how the psychological factors identified in his report and the state hospital's report had affected Davis's behavior. Apart from the basic information gleaned during his seventy-minute interview of him, the only other information Dr. Jenkins had was contained in the state hospital report which failed to address the issue of mitigation.

The jury convicted Davis of capital murder and sentenced him to death. On direct appeal to the Arkansas Supreme Court, he argued the trial court's denial of his motion for an independent psychological examination deprived him of his due process rights as articulated in Ake. The Court, relying on an Arkansas case which

did not address the development of mitigation evidence, concluded the examination at the state hospital was sufficient to meet the requirements of due process.

> This court has held that it is not error for the trial court to refuse to grant an appellant's motion for a psychiatric examination by a private psychiatrist at state expense. Perhaps most persuasive is the recent case of Sanders v. State, 308 Ark. 178, 824 S.W.2d 353 (1992):
>
>> With respect to the question of a defendant's *sanity* at the time an offense was committed and *competency to stand trial*, this court has held that the statutorily provided review by a state hospital is sufficient.

Davis v. State, 863 S.W.2d 259, 265 (Ark. 1993) (Davis I) (emphasis added) (citations omitted).

On appeal to the Arkansas Supreme Court from the denial of his motion for Rule 37 relief (state post-conviction proceedings), Davis again argued the trial court's denial of his motion for an independent psychiatric examiner deprived him of his due process rights under Ake. The Court rejected his arguments, holding the issue had been fully addressed and rejected on direct appeal.

> Notwithstanding our consideration of this issue in the direct appeal, appellant now argues that our decision in that appeal did not reach the question of the employment of a private psychiatrist to assist in the sentencing phase. We disagree and hold that Davis I, supra, reflects the consideration at trial of evidence produced through two examinations. Those examinations revealed, in addition to the lack of psychosis, a showing of psychological problems relating to the presence of mitigating circumstances, such as ADHD, psychoactive substance abuse, and antisocial personality disorder.

Davis v. State, 44 S.W.3d 726, 731 (Ark. 2001) (Davis II).

Davis next filed for habeas corpus relief under 28 U.S.C. § 2254. The district court identified <u>Ake</u> as the controlling federal precedent and concluded the state courts had considered, and properly rejected, his claim he should have been provided an expert psychiatrist to develop evidence of mitigation. In so holding, the district court noted Dr. Jenkins testified at trial and provided mitigating evidence on Davis's behalf. For example, the doctor described the effects of ADHD and testified it is much more likely for a person with the disorder to be arrested for criminal behavior. He further testified that when combined with drug abuse and emotional neglect, ADHD may cause a person to use poor judgment and "be in the middle of [a situation] before they recognize how right and wrong it is and the consequences of it." The district court concluded

> Davis received what <u>Ake</u> requires: access to a psychiatrist's assistance on the issue of sanity at the time of the offense. Davis had "access to a competent psychiatrist who [conducted] an appropriate examination and assisted[ed] in evaluation, preparation, and presentation of the defense." This same mental health expert provided mitigating evidence on behalf of Davis for purposes of sentencing.

Dist. Ct. Order at. 8 (citation omitted).

After the denial of Davis's § 2254 petition, we granted a certificate of appealability and this appeal followed.

II

Our review of Davis's due process claim is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). We may not grant a writ of habeas corpus with respect to any issue decided by the Arkansas courts unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the decision "was based on an

-21-

unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001) (explaining § 2254(d)(1)'s legal standard). When reviewing a district court's denial of a § 2254 petition, we review the district court's findings of fact for clear error and conclusions of law (as cabined by AEDPA) de novo. King v. Bowersox, 291 F.3d 539, 540 (8th Cir. 2002).

In Ake, the Supreme Court recognized the crucial role psychiatric evidence plays in a "defendant's ability to marshal his defense." 470 U.S. at 80.

> In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

Id. at 80-81 (citation omitted).

> By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise,

and then laying out their investigative and analytic process to the jury, *the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them.*

Id. at 81 (emphasis added).

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, *the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.*

Id. at 83 (emphasis added).

Applying the same reasoning to the need for the assistance of a psychiatric expert during the sentencing phase of a trial, the Court held

> Without a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor. *In such a circumstance, where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase.*

Id. at 84 (emphasis added).

Thus, under Ake, when the defendant's mental condition is a "significant factor" in a capital case, the state must guarantee a defendant access to a competent psychiatrist who will perform an "appropriate examination." In such cases, the

-23-

defendant's interests in accessing expert assistance outweigh the state's economic interests in avoiding the cost of providing an expert. Id. at 82.

### A. Mental Condition – Significant Factor

The state does not dispute Davis's mental condition was a significant factor at trial. He attempted to mount an insanity or diminished capacity defense and as a result the court ordered two psychiatric evaluations. The examinations did not support his intended defense but one alluded to the possibility of a mental disease or defect relevant to mitigation. Thus, I conclude Davis's mental condition was a significant factor and there was "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." Little v. Armontrout, 835 F.2d 1240, 1244 (8th Cir. 1987) (applying Ake).

### B. Appropriate Examination

Davis received two psychological examinations by order of the trial court. The first, by Dr. Jenkins, consisted of an interview lasting approximately one hour and ten minutes and concluded he did not suffer from any psychosis which would prevent him from appreciating the wrongfulness of his actions or render him incompetent to stand trial. The examination also concluded he suffered from ADHD, which potentially contributed to the commission of the offenses. Dr. Jenkins, however, did not conduct any additional interviews, perform any psychological testing or review additional materials to further develop evidence of mitigation.

Following Dr. Jenkins's cursory examination, Davis underwent a thirty-day evaluation at the state hospital which also concluded he was not legally insane and was competent to stand trial. Notably, the examination concluded he suffered from antisocial personality disorder and drug/alcohol abuse but offered no opinions with

respect to how those diagnoses may have contributed to the commission of the crimes.

Davis contends the examinations were inadequate to meet the requirements of Ake. In support of his argument, he directs the court to the affidavit of Dr. John N. Marr, Ph.D.; the expert he asked the trial court to appoint. Dr. Marr's affidavit states had he been appointed to assist Davis in developing evidence of mitigation, he would have interviewed him, his friends and family, and administered psychological tests, including an MMPI and the Gordon Diagnostic Test for ADHD. Additionally, Dr. Marr indicates an appropriate examination would have at minimum required a complete neuropsychological examination because of Davis's history of a head injury and psychological trauma endured as a child, i.e., parental neglect and abandonment. Further, Dr. Marr would have fully investigated and developed information related to his learning disabilities, poor performance in school, drug/alcohol abuse, and lack of consistent, focused treatment for his ADHD. Finally, Dr. Marr's affidavit indicates he believed this comprehensive evaluation would have significantly aided in Davis's defense.

The state contends the psychological evaluation Davis received from Dr. Jenkins satisfied the requirements of Ake. Indeed, the state focuses solely on the examination and argues because he was able to explain the diagnosis of ADHD and offer opinions about how it may affect sufferers, Ake was satisfied.

1.      The State Hospital Examination

In Davis I, the Arkansas Supreme Court noted he had been examined by Dr. Jenkins, but relied only on the examination conducted at the state hospital in holding Ake had been satisfied. In Davis II, the Court reiterated its earlier holding but added that because Dr. Jenkins's and the state hospital's examinations identified various

-25-

psychological diagnoses – all potentially mitigating factors – the information was available to the jury and <u>Ake</u> was satisfied. I respectfully disagree.

Simply acknowledging the examinations identified various diagnoses which might "relat[e] to the presence of mitigating circumstances," <u>Davis II</u>, 44 S.W.3d at 731, is woefully inadequate to satisfy <u>Ake</u>. Both <u>Davis I</u> and <u>Davis II</u> ignore the fact the state hospital report offered no opinions about mitigation. Thus, those holdings "were based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2). Additionally, <u>Davis I</u> and <u>Davis II</u> are clearly contrary to our precedent interpreting <u>Ake</u>.

In <u>Starr v. Lockhart</u>, 23 F.3d 1280, 1283-84 (8th Cir. 1993), the defendant was charged with capital murder in Arkansas. As in Davis's case, the defendant in <u>Starr</u> asserted a diminished capacity defense and received a court ordered psychological examination at the Arkansas state hospital. The state hospital report identified Starr as suffering from mental retardation, and his strategy at trial was to offer his mental retardation as evidence of diminished capacity during the guilt phase and as mitigation during the sentencing phase. <u>Id.</u> at 1287. To this end, Starr requested the appointment of a psychological expert to help him develop and present the evidence. The trial court, however, denied the request holding Starr's ability to subpoena the mental health professionals involved in the state hospital examination satisfied the requirements of due process. <u>Id.</u> On appeal from the district court's denial of habeas relief, this court reversed finding, as to the penalty phase only, the denial of Starr's request for an expert violated <u>Ake</u> because 1) the examination was not appropriate to his needs, and 2) the ability to subpoena a state examiner does not amount to expert assistance as required by <u>Ake</u>. The court specifically found "that a report on the [] statutorily mandated items does not suffice to cover everything a defendant might raise as a 'mental defect' in mitigation and for which <u>Ake</u> is required." <u>Id.</u> at 1289.

[The state hospital report] can only establish that Starr is criminally responsible for his acts, not the degree of such responsibility. The difference between Starr's perceptions of the probable results of the acts he committed and those of a person of normal mental capabilities, a crucial issue for Starr, was not addressed either by the report or the underlying examination.

* * *

For this reason, Starr needed an expert to make an appropriate examination and to explain the effects of his retardation on his relative culpability at the sentencing phase of the proceedings.

Id. at 1290.

In Starr, this court specifically rejected the district court's conclusion that the ability to subpoena the state examiners satisfied due process. "Before Ake, the ability to subpoena and question a neutral expert on whose examination both the state and the defense were relying may have satisfied due process. However, Ake expressly disavows [such a result] and explains that the requirements of due process have fundamentally changed." Starr, 23 F.3d at 1290-91 (citation omitted). Therefore, to the extent Davis I and Davis II rely on Davis's access to the state hospital report, the decisions are contrary to the clearly established dictates of Ake.

2.     Dr. Jenkins's Examination

Davis I and Davis II also mention the examination conducted by Dr. Jenkins. The decisions, however, offer no analysis as to how the doctor's examination satisfies the requirements of Ake, except to say his report mentioned ADHD "which could have contributed to the commission of the offenses," Davis I, 863 S.W.2d at 265, and "[t]his testimony was available for consideration by the jury in the sentencing phase," Davis II, 44 S.W.3d at 731.

Ake teaches the importance of a psychological expert is his ability to "gather facts, through professional examination, interviews, and elsewhere . . . . [And to] analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition." Ake, 470 U.S. at 1095. Such evidence is vital, because psychological experts "know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers." Id.

> [W]ithout the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense [or issues of mitigation] is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witness, the risk of an inaccurate resolution of [the psychological] issues is extremely high.

Id. at 1096.

This court has interpreted Ake to require an examination which "delve[s] into the mitigating questions essential to [the defendant]," Starr, 23 F.3d at 1289, and "[l]ike appointed counsel [a psychological expert] aid[s] the defendant and functions as a 'basic tool' in his or her defense," id. at 1291 (citation omitted). "To so function, they must be available to '*assist in evaluation, preparation, and presentation of the defense*.'" Id. (quoting Ake, 470 U.S. at 83) (emphasis added).

The examination Davis received from Dr. Jenkins does not come close to satisfying the requirements of Ake. To fulfill the requirements of due process, Ake contemplates an expert who, following a full and thorough examination, works side by side with the defendant and defense counsel to build a defense strategy. It assumes the expert will be available to provide information regarding the defendant's mental condition and assist defense counsel in presenting the information effectively. Under Ake, the expert must be available to assist in anticipating and rebutting the

-28-

prosecution's case. In other words, the expert serves as a "basic tool" much like defense counsel.

Here, there can be no question Dr. Jenkins only provided meager assistance to the defense. His examination can best be described as cursory and, because he had only the most basic information, his conclusions were preliminary and undeveloped. He did not conduct even the most rudimentary psychological testing, conducted no additional interviews, and was not provided an opportunity to review relevant medical, educational and psychological records from Davis's past. Dr. Jenkins's court-ordered examination of Davis lasted only seventy minutes. In those seventy minutes his primary objective was to evaluate whether Davis was sane at the time of the crimes and whether he was competent to stand trial. Such means Dr. Jenkins only spent *minutes* developing his opinions regarding possible mitigation evidence. Finally, although the doctor was called by the defense to testify about mitigation, his examination, as with the state hospital examination, was court ordered. This court has specifically held "the ability to subpoena and question a neutral expert on whose examination both the state and the defense were relying" no longer satisfies the requirements of due process. Starr, 23 F.3d at 1290-91. Under the facts of this case, Dr. Jenkins's examination falls so short of what Ake anticipates I conclude the state courts' denial of Davis's claim was an unreasonable application of clearly established Supreme Court precedent.

> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however, long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

-29-

Because I would reverse the district court's denial of habeas corpus relief and order the issuance of the writ, I respectfully dissent.

_____